**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

UNITED STATES OF AMERICA

v.                                                      CRIMINAL ACTION NO.   3:17-00222-02

JONATHAN CHAFIN

**MEMORANDUM OPINION AND ORDER**

Currently pending before the Court is Defendant's Motion to Suppress Statements and Evidence. ECF No. 38. For reasons specified herein, Defendant's Motion is **DENIED**.

## I.      Background

On December 7, 2017 at approximately 8:54 a.m., Sergeant J.J. Napier of the West Hamlin Police Department ("Sgt. Napier") stopped a black Ford Fusion after seeing the vehicle weave and drive left of center in the area of Virginia Street and Route 10 in West Hamlin, West Virginia. ECF No. 39, at 1; ECF No. 49, at 1. A video recording of the stop was captured via Sgt. Napier's body camera, ECF No. 54-1, which Sgt. Napier turned on after he pulled the Ford Fusion over and prepared to exit his patrol car. Sgt. Napier approached the Ford Fusion on foot at 8:54:36 a.m. Government's Exhibit 1 (Body Camera Video Recording), ECF No. 54-1. At that time, Sgt. Napier found that there were four occupants within the vehicle – Tyler Burns sat in the driver's seat, Lucas Tomblin sat in the front passenger seat, Robert Reid sat in the backseat on the driver side, and Defendant sat in the backseat on the passenger side. ECF No. 49. Sgt. Napier immediately recognized Burns from having had multiple prior interactions with him.

The series of events that followed is discussed in more precise detail below, but for purposes of background the Court will briefly summarize it here. Sgt. Napier began the stop by

commenting on movement that he had observed in the backseat of the car before he approached. ECF No. 54-1, at 8:55:00. Defendant responded by handing Sgt. Napier a backpack through the back driver side window, saying, "You can search it." *Id.*, at 8:56:06. Sgt. Napier then asked everyone in the car to produce identification. *Id.*, at 8:56:17. When no one, including the driver, could produce identification, Sgt. Napier asked the three passengers to provide him with their names and dates of birth. *Id.*, at 8:57:02. Sgt. Napier then returned to his patrol car and relayed the names and dates of birth as they had been provided to him by the three passengers to Lincoln 911 dispatch. *Id.* His purpose in doing so was to determine whether there were any outstanding warrants for arrest as to any of the subject individuals. *Id.*

At 9:04:17, Lincoln 911 dispatch responded to Sgt. Napier's inquiry and advised that there were two outstanding warrants for the arrest of Lucas Tomblin, the individual seated in the front passenger seat of the Ford Fusion. ECF No. 54-1. Upon learning of the warrants, Sgt. Napier exited his patrol car, returned to the Ford Fusion, and asked Tomblin to step out of the vehicle at 9:05:08. *Id.* Sgt. Napier placed Tomblin in handcuffs, searched his person, and then placed him in the backseat of the police cruiser at 9:08:25. *Id.*

At 9:08:45, Sgt. Napier returned to the Ford Fusion and began searching the front passenger side of the car where Tomblin had been sitting. *Id.* Sgt. Napier then opened the rear passenger door and directed Defendant to step out of the vehicle. *Id.*, at 9:09:30. After briefly searching Defendant's person, Sgt. Napier pulled a duffel bag out from the floor of the rear passenger side of the Ford Fusion. ECF No. 54-1, at 9:09:52. After repeatedly asking Burns, Reid, and Defendant whose bag he had just pulled out of the car, and after all three individuals denied any ownership or knowledge of the bag, Sgt. Napier placed Defendant in handcuffs at 9:10:25. *Id.*

Sgt. Napier directed Defendant, then handcuffed, to sit on the ground next to the Ford Fusion while he removed both Reid and Burns from the vehicle, searched them briefly, and placed handcuffs on each of them as well. *Id*., at 9:11:07–9:13:24. After all three were handcuffed and sitting on the ground next to the Ford Fusion, and Tomblin remained in the backseat of the police cruiser, Sgt. Napier opened the duffel bag he had previously removed from the car and found several firearms with price labels affixed to them. *Id*., at 9:14:15. Over the remaining 12 minutes of recording, Sgt. Napier removed the firearms one by one from the duffel bag, placed each on the ground outside of the car, and communicated via his radio to inform dispatch of his discoveries and to ask dispatch to inquire as to any recent pawn shop robberies in the area. *Id*., at 9:14:15–9:26:58. The body camera recording ended at 9:26:58 a.m. *Id*.

After discovering the firearms, and after the conclusion of the recording, Sgt. Napier advised Defendant of his *Miranda* rights. ECF No. 39, at 3; ECF No. 49, at 6. Thereafter, Defendant confessed to having broken into Sportsmen's Gun and Pawn with Reid earlier in the day and admitted that he and Reid had stolen the firearms discovered in the duffel bag. *Id*. Defendant further admitted that he had participated in a prior break-in of the same pawn shop in May of 2017. *Id*. Defendant repeated these admissions in a subsequent interview with a different government agent. *Id*.

On December 20, 2017, a Grand Jury returned a four-count indictment against Defendant and Reid. ECF No. 10. Defendant was named in two of the four counts. *Id*. Count Three of the indictment charges Defendant and Reid, aided and abetted by each other, with knowingly stealing several firearms. *Id*., at 10. Count Four charges Defendant and Reid, aided and abetted by each other, with knowingly possessing stolen firearms. *Id*., at 11.

Defendant now asks this Court to suppress both the physical evidence – the firearms recovered from the duffel bag – and the statements that Defendant made after the firearms had been discovered. Defendant argues that Sgt. Napier improperly searched the vehicle in which the duffel bag was found, ECF No. 39, and that Sgt. Napier "impermissibly extended the stop beyond the time reasonably required to complete the purposes of the stop," ECF No. 55. The Government argues that Defendant has no standing to challenge either the search of the vehicle or the search of the duffel bag. ECF No. 49. The Government further argues that, to whatever extent Sgt. Napier extended the stop beyond its original purpose, that extension was constitutionally permissible. *Id*.

## II.     Objection to Searches

To raise a Fourth Amendment claim in objection to the search of a place or an item, a defendant must have had "a reasonable expectation of privacy in the area searched or the item seized" at the time of the search. *United States v. Rusher*, 966 F.2d 868, 874 (4th Cir. 1992). Further, "[t]he defendant bears the burden of proving that he has a reasonable expectation of privacy." *Id*. As explained herein, the Court finds that Defendant had no reasonable expectation of privacy in either the duffel bag or the Ford Fusion and, as such, has no standing to contest the search of either.

### a.   Objection to Search of Car

First, Defendant lacks standing to challenge the search of the Ford Fusion. "[A] passenger normally has no legitimate expectation of privacy in a car in which he asserts neither a property interest nor a possessory interest . . ." *Rusher*, 966 F.2d at 874. *See also Rakas v. Illinois*, 439 U.S. 128, 150 (1978) (finding that passengers in a car who had no possessory or ownership interest in the vehicle lacked a legitimate expectation of privacy in the car and accordingly that they did not have standing to raise a Fourth Amendment challenge to a search thereof); *United States v. Carter*,

300 F.3d 415, 421 (4th Cir. 2002) (finding that a defendant lacked standing to challenge the search of a car in which he was a passenger and in which he had no property or possessory interest).

In this case, Defendant claims no property or possessory interest in the Ford Fusion that was searched. Additionally, he was a passenger in the car at the time Sgt. Napier stopped the vehicle and subsequently searched it. Accordingly, Defendant had no reasonable expectation of privacy in the car at the time of the search. As such, he now lacks standing to challenge the propriety of Sgt. Napier's search of the car.

### b. Objection to Search of Bag

In addition to lacking standing to contest Sgt. Napier's search of the Ford Fusion, the Court finds that Defendant has no standing to contest Sgt. Napier's search of the duffel bag. "The law is well established that a person who voluntarily abandons property loses any reasonable expectation of privacy in the property and is consequently precluded from seeking to suppress evidence seized from the property." *United States v. Leshuk*, 65 F.3d 1105, 1111 (4th Cir. 1995) (declining to suppress evidence where the defendant denied ownership of certain backpacks and a garbage bag and police officers thereafter searched them, recovering the items the defendant sought to suppress). "Denial of ownership . . . constitutes abandonment." *United States v. Han*, 74 F.3d 537, 543 (4th Cir. 1996).

During the stop in this case, after directing Defendant to step out of the vehicle, Sgt. Napier reached for the duffel bag on the floor of the backseat and asked Defendant, Reid, and Burns, "Whose bag's this?" ECF No. 54-1, at 9:09:54. No one replied. *Id*. Sgt. Napier asked the same question for a second time at 9:10:10 a.m. *Id*. Again, no one replied. *Id*. Sgt. Napier then removed the duffel bag from the vehicle and raised his voice, asking more forcefully, "Whose bag is this? I'm not going to ask again. Whose bag is this?" *Id*., at 9:10:05. When no one responded, Sgt.

Napier pointed to Defendant and asked Defendant directly, "Is it your bag?" ECF No. 54-1, at 9:10:11. Defendant responded by vigorously shaking his head no and saying, "It's not my bag." *Id*.

The body camera recording clearly shows that Defendant denied any ownership interest in the duffel bag at the time of the stop. As such, the Court finds that Defendant voluntarily abandoned the duffel bag and therefore lost any reasonable expectation of privacy he had in it at the time of his denial. Accordingly, Defendant is precluded from seeking to suppress the firearms recovered during Sgt. Napier's search of the duffel bag on these grounds.

### III. Objection to Length of Stop

Though Defendant has no standing to contest the searches of the duffel bag or the car, the Court finds that he does have standing to challenge the seizure of his person during the traffic stop. "[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of the [Fourth and Fourteenth] Amendments . . ." *Delaware v. Prouse*, 440 U.S. 648, 654 (1979). It is uncontested that, after seeing the Ford Fusion weave and cross center, Sgt. Napier stopped the vehicle and detained its occupants beginning at 8:45 a.m. on December 7, 2017. Because Defendant was detained, he thus has standing to contest the propriety and constitutionality of that detention. *See Brendlin v. California*, 551 U.S. 241, 259 (2007) ("If either the stopping of the car, the length of the passenger's detention thereafter, or the passenger's removal from it are unreasonable in a Fourth Amendment sense, then surely the passenger has standing to object to those constitutional violations and to have suppressed any evidence found in the car which is their fruit.") (internal citation and quotation omitted).

Pursuant to this standing, Defendant argues that Sgt. Napier "impermissibly extended the stop beyond the time reasonably required to complete the purposes of the stop." ECF No. 55, at 1.

Because a traffic stop constitutes a seizure of a vehicle and its occupants, the Constitution requires that limits be placed on police conduct during routine traffic stops. *Rusher*, 966 F.2d at 875. To determine those limits, the Fourth Circuit requires the Court to consider both whether a traffic stop is "justified at its inception" and whether the officer's actions during the stop that proceeds are "reasonably related in scope to the circumstances which justified the [stop] in the first place." *Id.*

### a. Inception of Stop

The propriety of the initial stop of the Ford Fusion in this case is essentially uncontested. In his Memorandum in support of his Motion to Dismiss, Defendant submits that, in the body camera recording, Burns "admits he was weaving." ECF No. 39, at 2. A law enforcement officer is permitted to stop a vehicle when he or she sees that vehicle violate a traffic law. *See United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2012). *See also United States v. Palmer*, 820 F.3d 640, 649 (4th Cir. 2016) (A traffic stop is reasonable in its inception "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. Without question, such a violation may include failure to comply with traffic laws.") (internal citation and quotation omitted). In this case, Sgt. Napier was on patrol when he observed the Ford Fusion, driven by Burns, weave and cross left of center. Sgt. Napier, based on his training and experience, knew this movement to constitute a traffic violation and accordingly conducted a traffic stop of the Ford Fusion. Because Sgt. Napier saw the Ford Fusion violate a traffic law, the Court finds that the stop at issue was "justified at its inception."

### b. Detention Within Scope of Routine Traffic Stop

"Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008). *See also Arizona v. Johnson*,

555 U.S. 323, 333 (2009) ("A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop."). Such "traditional incidents of a routine traffic stop" include requesting a driver's license and vehicle registration, running a computer check, and issuing a citation. *Branch*, 537 F.3d at 336.

Because "[t]he maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision," the "appropriate constitutional inquiry is whether the detention lasted longer than was necessary, given its purpose." *Id*. The purposes of a traffic stop are "to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 135 S.Ct. 1609, 1614 (2015) (internal citation and quotation omitted). An officer may, however, "conduct certain unrelated checks during an otherwise lawful traffic stop" so long as he does so in a way that does not prolong the stop. *Id*., at 1615. For reasons discussed herein, the Court finds that from 8:54:42 a.m. to 9:08:25 a.m., Sgt. Napier's detention of Defendant was proper because Sgt. Napier's actions during that time were within the scope of the "traditional incidents of a routine traffic stop."

### i.  8:54:42–8:57:59[1]

This first segment of the body camera recording of the traffic stop shows Sgt. Napier exit his patrol vehicle and approach the Ford Fusion. ECF No. 54-1. At the time of this approach, Burns had his window rolled down and Sgt. Napier could see Tomblin, Reid, and Defendant also in the vehicle. *Id*. Sgt. Napier told Burns that he had seen the vehicle weaving and then commented that he had seen "a lot of movement in the backseat." *Id*., at 8:55:02. Sgt. Napier asked the vehicle's

---

[1] These times correspond to the times as reflected by the recording from the body camera Sgt. Napier wore during the course of the traffic stop.

occupants at that time, "Is there anything in this car, boys, that I need to know about?" *Id*. After the vehicle's occupants indicated there was not, Sgt. Napier shifted his attention to the occupants in the backseat of the vehicle, saying, "I'm not focusing much right now on the driver." *Id*. At that time, Sgt. Napier asked the occupants in the backseat to roll the vehicle's rear driver side window down. *Id*., at 8:55:11.

After he could see all four of the vehicle's occupants, Sgt. Napier spent the following minute talking with them. ECF No. 54-1, at 8:55:11–8:56:00. He asked again whether there was anything in the car he needed to know about and warned the occupants that if he called a drug dog to the scene and the dog alerted to the presence of drugs in the vehicle, all of the vehicle's occupants would be placed under arrest. *Id*. The occupants of the vehicle indicated that there were no drugs in the car. *Id*. Sgt. Napier then repeated his comment regarding the movement he had seen in the backseat. *Id*., at 8:56:03. He pointed directly at Defendant, saying, "You [were] the one who was moving." *Id*. At that point in time, Defendant handed Sgt. Napier a backpack through the backseat driver side window, saying, "You can search it." *Id*., at 8:56:07.

At 8:56:10, Sgt. Napier began inquiring as to the identities of the vehicle's occupants and asked all four to produce identification. ECF No. 54-1. None of the four could produce any sort of identification, each naming a different reason for his inability to do so. *Id*. Sgt. Napier then took out a pen and paper and asked each of the three passengers in the vehicle to provide their names and dates of birth. *Id*. After writing the names and dates of birth of the passengers, Sgt. Napier told Burns, "I [am not] going to write you a ticket for left of center so don't worry about it." *Id*., at 8:57:59.

The Court finds that Sgt. Napier's actions during this segment of the traffic stop were unquestionably within the scope of a routine traffic stop such that there was no impermissible

extension thereof.[2] First, Sgt. Napier was permitted to identify and discuss the reason for the stop with the vehicle's driver. The time spent doing so was aimed directly at "address[ing] the traffic violation that warranted the stop," *Rodriguez*, 135 S.Ct. at 1614, and was accordingly proper.

Next, Sgt. Napier was permitted to inquire into the movement he had seen in the backseat of the vehicle before his approach. Because "traffic stops are especially fraught with danger to police officers," the Fourth Circuit has iterated a "strong interest in allowing an officer to complete his traffic mission safely." *Palmer*, 820 F.3d at 651 (internal citation and quotation omitted). By questioning the vehicle's occupants about the movement, Sgt. Napier was "attend[ing] to related safety concerns," *Rodriguez*, 135 S.Ct. at 1614, and was therefore acting within the scope of a routine traffic stop.

Finally, Sgt. Napier took the names and dates of birth of the vehicle's passengers. In the Fourth Circuit, an officer may collect the information of both a driver and his passengers for the purpose of searching a computer database for outstanding warrants for those individuals. *United States v. Hill*, 852 F.3d 377, 383 (4th Cir. 2017). Because doing so ensures officer safety during the course of a routine traffic stop, such conduct falls comfortably within the scope of the traditional incidents of the stop. *Id.*

Because Sgt. Napier's conduct from 8:54:42 a.m. to 8:57:59 a.m. fell within the scope of a routine traffic stop, his corresponding detention of the vehicle and its occupants during this segment of the stop was proper. *See Rodriguez*, 135 S.Ct. at 1614.

### ii. 8:58:00–9:08:25

At 8:57:59 a.m., Sgt. Napier told Burns that he was not going to issue a citation for the

---

[2] Defendant essentially concedes as much in his Reply to the Government's Response to Defendant's Motion to Suppress. ECF No. 55, at 1 ("[T]he reason for the stop was over once Sergeant Napier announced he was not going to write them a ticket . . .").

traffic violation. *Id.*, at 8:57:59. Defendant argues that, at this moment in time, Sgt. Napier's investigation of the traffic violation ended and that, accordingly, his grounds for reasonable detention of the vehicle and its occupants also expired. ECF No. 55. While it is true that "the tolerable duration of police inquiries in the traffic stop context is determined by the seizure's mission," the mission of a traffic stop is twofold: "to address the traffic violation that warranted the stop" and to "attend to related safety concerns." *Rodriguez*, 135 S.Ct. at 1614.

Just because Sgt. Napier said at 8:57:59 a.m. that he was not going to write a ticket for the traffic violation does not mean that his mission was completed. "Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop." *Id.*, at 1615 (internal citation and quotation omitted). These inquiries may reasonably include "search[ing] a computer database . . . to determine an individual's prior contact with local law enforcement." *Hill*, 852 F.3d at 383. Additionally, "an officer may engage in the indisputably proper action of searching computer databases for an individual's outstanding warrants." *Id.* "An officer may take such measures with respect to both the driver and passengers of a stopped vehicle to ensure officer safety." *Id.*

At 8:58:00 a.m., Sgt. Napier confirmed the names and dates of birth of the car's three passengers and returned to his police cruiser to run that information through dispatch to check for outstanding warrants. ECF No. 54-1. Doing so was "indisputably proper" pursuant to Fourth Circuit law. *Hill*, 852 F.3d at 383. At 9:04:17 a.m., the dispatch controller advised that there were two warrants out for the arrest of one of the passengers in the Ford Fusion, Tomblin. *Id.* At that time, Sgt. Napier had the authority to execute the arrest warrants as to Tomblin, which he did. ECF No. 54-1.

At 9:05:08 a.m., Sgt. Napier again approached the Ford Fusion, opened the front passenger

door, and instructed Tomblin to step out of the vehicle. *Id*. Sgt. Napier then placed handcuffs on Tomblin and conducted a search of his person before placing Tomblin in the back of the police cruiser at 9:08:25 a.m. The Court finds that Sgt. Napier's conduct from 8:54:42 a.m. to 9:08:25 a.m. was reasonably within the scope of a routine traffic stop and that his detention of Defendant was therefore proper during the length of this time. The Court notes, however, that the segment of the stop lasting from 8:58:00 a.m. to 9:08:25 a.m. was also supported by Sgt. Napier's reasonable suspicion of criminal activity, as discussed below.

### c. Detention Pursuant to Reasonable Suspicion

"Although law enforcement officers may stop a vehicle that they observe is violating a traffic law . . . the officers may not detain the vehicle for longer than necessary to accomplish the purposes of the stop." *Ortiz*, 669 F.3d at 444 (internal citation and quotation omitted). "Any detention longer than reasonably necessary to accomplish the purposes of the stop must be justified by at least a reasonable suspicion of other criminal activity." *Id. See also United States v. Brugal*, 209 F.3d 353, 359 (4th Cir. 2000) ("[A]n officer [must] have a reasonable suspicion that criminal activity is afoot before he may . . . continue to seize a person following the conclusion of the purposes of a valid stop."); *Branch*, 537 F.3d at 336 ("If a police officer wants to detain a driver beyond the scope of a routine traffic stop, . . . he must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place.").

To demonstrate the requisite reasonable suspicion to continue the detention of a vehicle and its occupants after he has completed the purposes of the traffic stop, "a police officer must offer specific and articulable facts that demonstrate at least a minimal level of objective justification for the belief that criminal activity is afoot." *Branch*, 537 F.3d at 337. While there is no precise definition of what constitutes reasonable suspicion, the Fourth Circuit has provided

ample guidance for the Court's inquiry into the question. *Branch*, 537 F.3d at 336. Specifically, the Fourth Circuit has prescribed four considerations for trial courts to undertake in their evaluations of routine traffic stops extended pursuant to reasonable suspicion.

### i. Legal Considerations for Reasonable Suspicion

First, the Court notes that the standard of reasonable suspicion is "less demanding" than that of probable cause. *Branch*, 537 F.3d at 336 (internal citation and quotation omitted). In order to justify the extension of a traffic stop beyond the time required to complete the traditional incidents of a routine traffic stop, "a police officer must simply point to specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Id*. (internal citation and quotation omitted).

Second, the Fourth Circuit instructs this Court to consider the context of the police action in question. *Branch*, 537 F.3d at 336. "[A]ctions that may appear innocuous at a certain time or in a certain place may very well serve as a harbinger of criminal activity under different circumstances." *Id*. Further, "judicial review of police action should not serve as a platform for unrealistic second-guess of law enforcement judgment calls." *Id*., at 337 (internal citation and quotation omitted). The Court must give deference to the training and expertise of police officers when reviewing their actions in particular circumstances. *Id*.

Third, the court "must look at the cumulative information available to the officer" at the time of the stop in question and "not find a stop unjustified based merely on a piecemeal refutation of each individual fact and inference." *Branch*, 537 F.3d at 337 (internal citation and quotation omitted). While a set of factors, taken individually, may be "quite consistent with innocent travel," those factors may support a finding of reasonable suspicion when taken together. *Id*. (internal

citation and quotation omitted). Thus, the Court should review the circumstances of the stop holistically. *Id.*

Finally, "a police officer's decision to stop and detain an individual must be evaluated objectively." *Branch*, 537 F.3d at 337. "[I]f sufficient objective evidence exists to demonstrate reasonable suspicion," then a stop is justified "regardless of a police officer's subjective intent." *Id.*

### ii. Sgt. Napier's Reasonable Suspicion

The Court finds that Sgt. Napier successfully completed the "mission" of the traffic stop when he placed Tomblin in the back of the police cruiser. At that time, Sgt. Napier had decided against issuing a traffic citation and had completed the process of running the names of the car's occupants through police databases to check for warrants. He had, therefore, "address[ed] the traffic violation that warranted the stop" and "attend[ed] to related safety concerns," thereby completing the mission of the stop. *Rodriguez*, 135 S.Ct. at 1614. Even so, however, the Court finds that continuing the stop for the remaining six minutes (from 9:08:25 a.m. to 9:14:15 a.m., the time at which Sgt. Napier found the guns in question) was justified and reasonable pursuant to Sgt. Napier's reasonable suspicion of criminal activity. The Court will explain this finding by examining the remainder of the stop in segments. Those segments are defined by the subheadings contained herein.

### a. 8:58:00–9:08:25

As previously discussed, the Court finds that this segment of the traffic stop was reasonable because Sgt. Napier's conduct during this time fell within the scope of a routine traffic stop. In the alternative, however, the Court also finds that this segment of the stop was proper pursuant to Sgt. Napier's reasonable suspicion of criminal activity.

The Court finds that, by 8:57:59 a.m., there were sufficient "specific and articulable facts" to support a finding of reasonable suspicion such that Sgt. Napier could have permissibly and reasonably extended the traffic stop pursuant thereto. By that time, Sgt. Napier had several grounds to support his reasonable suspicion of criminal activity. First, as soon as Sgt. Napier stopped the vehicle he observed the vehicle's backseat passengers move around considerably and then saw Defendant, sitting in the passenger side of the backseat, disappear from view as though to access something or to place something on the floor of the car beneath his feet. Second, after Sgt. Napier approached the vehicle on foot, the vehicle's driver, Burns, seemed excessively nervous. Throughout the first few minutes of his interaction with Sgt. Napier, Burns drummed his fingers on the steering wheel, breathed rapidly, and avoided eye contact. At one point Burns even lit and began to smoke a cigarette while Sgt. Napier was talking with him. ECF No. 54-1, at 8:55:30. Third, Sgt. Napier had a unique perspective from which to evaluate Burns' demeanor and conduct because Sgt. Napier had a long history of interactions with Burns. The officer knew that Burns' behavior was out of character for him and that the driver was more nervous than usual. Fourth, Sgt. Napier knew by 8:58 a.m. that neither the driver of the vehicle nor any of the passengers had personal identification.

Bearing in mind that the standard of reasonable suspicion is less demanding than that of probable cause, noting that the cited factors supporting Sgt. Napier's reasonable suspicion are to be interpreted in context, and considering that the factors are to be reviewed holistically and objectively, the Court finds that Sgt. Napier had reasonable suspicion of criminal activity such that his continued detention of the vehicle and its occupants after 8:58 a.m. was proper. *See, e.g., Branch,* 537 F.3d at 338–340 (finding reasonable suspicion where the stopped vehicle had been stopped less than a month before, the driver was acting nervously, the driver and the passenger

both avoided eye contact, and the car was not registered to the driver).

Defendant argues that Sgt. Napier's suspicion was unreasonable and was not supported by the requisite articulable grounds. Specifically, Defendant asks this Court to dismiss the erratic and suspicious behavior of Burns because "a driver's nervousness is not a particularly good indicator of criminal activity." ECF No. 55, at 3 (citing *United States v. Bowman*, 884 F.3d 200, 214 (4th Cir. 2018)). On the contrary, however, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

The court in *Bowman* found that an officer lacked the requisite grounds for reasonable suspicion when the officer cited only the driver's shaking hands, the passenger's fidgeting and avoidance of eye contact, and both the driver's and the passenger's increased heart rates as factors supporting his suspicion. *Bowman*, 884 F.3d at 214. While the court in that case found that those factors were normal signs of nervousness that were "of limited value to reasonable suspicion analyses," the court also noted that "nervousness beyond the norm" may support a finding of reasonable suspicion. *Id.* (internal citation and quotation omitted).

That "nervousness beyond the norm," along with other suspicious conduct, is precisely what is present in the case now before this Court. When Sgt. Napier first approached the Ford Fusion, Burns was not simply fidgeting and avoiding eye contact, nor were his hands simply shaking out of nervousness. In addition to his rapid breathing and avoidance of eye contact, Burns anxiously drummed his thumbs on the steering wheel intermittently throughout the encounter and, at 8:55:30 a.m., lit and began to smoke a cigarette while talking with Sgt. Napier. ECF No. 54-1. Rapid breathing and shaking hands may be within the realm of "normal nervousness" that is easily discounted when considering the reasonableness of an officer's suspicion, but lighting and smoking a cigarette during an encounter with that officer certainly is not.

Additionally, the Fourth Circuit requires this Court to consider actions in context. *Branch*, 537 F.3d at 336. Sgt. Napier was not considering Burns' demeanor and conduct in a vacuum during this traffic stop. In fact, Sgt. Napier had known Burns since as far back as 2010. ECF No. 49, at 2. Sgt. Napier had interacted with Burns on several occasions – both contentious and not – and had had the opportunity to observe Burns' demeanor and conduct in several contexts prior to the stop now at issue. *Id*. As the Fourth Circuit has noted, "[r]easonable suspicion is a commonsense, nontechnical standard that relies on the judgment of experienced law enforcement officers, not legal technicians." *Palmer*, 820 F.3d at 650 (internal citation and quotation omitted). Sgt. Napier is unquestionably an experienced law enforcement officer and, at the time of this stop, he had a history of professional interactions with Burns that provided Sgt. Napier with unique context and insight to Burns' demeanor and conduct during the stop. Sgt. Napier's judgment is due great weight in the Court's consideration of the reasonableness of his suspicion.

Finally, the Court notes that it must not consider the factor of Burns' nervousness independently from all the other factors that Sgt. Napier cited as grounds for his reasonable suspicion of criminal activity. *Branch*, 537 F.3d at 337 ("[A] court's review of the facts and inferences produced by a police officer to support a . . . stop must be holistic."). "The reasonable suspicion determination does not depend upon any one factor, but on the totality of the circumstances." *Brugal*, 209 F.3d at 359. It was not just Burns' nervousness that gave rise to Sgt. Napier's reasonable suspicion. The officer's suspicion was also supported by the movement in the backseat of the vehicle before he approached, the contrast of Burns' behavior during the stop as compared to his behavior during Sgt. Napier's prior interactions with him, and the fact that no one in the vehicle could produce identification. Taken as a whole, these articulated grounds support a finding of reasonable suspicion.

**b. 9:08:25–9:09:21**

Though the Court finds that Sgt. Napier had the requisite reasonable suspicion to continue the detention of the Ford Fusion and its occupants by 8:58 a.m., the Court notes that the reasonableness of Sgt. Napier's suspicion only grew in justification as the stop went on. Accordingly, his continued detention of the vehicle and its occupants continued to be proper pursuant to that reasonable suspicion. "When an officer has reasonable suspicion of criminal activity, he may detain the suspect[s] so as to permit the officer to allay the suspicion." *Ortiz*, 669 F.3d at 444 (internal citation and quotation omitted).

After Sgt. Napier placed Tomblin in the back of the police cruiser at 9:087:25 a.m., he returned to the Ford Fusion. ECF No. 54-1, at 9:08:30. At 9:08:45 a.m., Sgt. Napier opened the front passenger door of the vehicle and began to search the area Tomblin had just occupied.[3] *Id.*

---

[3] The Court agrees with Defendant that Sgt. Napier's return to the Ford Fusion and his subsequent search of the front passenger compartment of the vehicle cannot properly be justified under the "search incident to arrest" exception to the warrant requirements of the Fourth Amendment. The law "authorizes police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" or "when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Arizona v. Gant*, 556 U.S. 332, 343 (2009) (internal citation and quotation omitted). In this case, Sgt. Napier directed Tomblin to step out of the vehicle and then he handcuffed Tomblin and searched his person before placing Tomblin securely in the back of the police cruiser. ECF No. 45-1, at 9:05:08–9:08:25. It was not until after Tomblin was handcuffed and placed in the back of the police cruiser that Sgt. Napier returned to the Ford Fusion to search the passenger compartment where Tomblin had been sitting. *Id.*, at 9:08:45. Tomblin was clearly secured and not within reaching distance of the passenger compartment at the time of the search. Additionally, Sgt. Napier arrested Tomblin pursuant to two different arrest warrants. While the parties have not disclosed to the Court in their briefing what crimes underlaid those arrest warrants, the Court assumes for purposes of this consideration that it was not reasonable to believe that evidence relevant to those crimes could have been found in the vehicle. Because Tomblin was secured and not within reaching distance of the passenger compartment at the time of the search in question and there were no grounds for a reasonable belief that evidence relevant to the crime of arrest might have been found in the vehicle, the Court finds that Sgt. Napier's search of the passenger compartment of the vehicle cannot be justified pursuant to the "search incident to arrest" exception to the warrant requirements of the Fourth Amendment.

Even so, however, the Court makes no finding as to whether this search was ultimately

At the time Sgt. Napier returned to the Ford Fusion after Tomblin's arrest, the continued detention of the vehicle and its occupants was justified by ongoing reasonable suspicion as Sgt. Napier sought to relieve that suspicion through further investigation. Under the rule of *Ortiz*, so long as his actions were supported by ongoing reasonable suspicion, Sgt. Napier was permitted to continue the detention of the Ford Fusion and its occupants until such time as he had the opportunity to allay his suspicion. *Id.*

At that point Sgt. Napier returned to the vehicle, he not only had the earlier-articulated grounds supporting his reasonable suspicion but he also knew then that one of the vehicle's occupants was the subject of two arrest warrants. In *United States v. Palmer*, the Fourth Circuit found that a police officer's discovery that the driver of a stopped vehicle had a criminal record, in combination with other factors, supported a finding of reasonable suspicion. 820 F.3d at 651–652. When Sgt. Napier discovered that one of the vehicle's occupants was the subject of two arrest warrants, his suspicion only became more reasonable and his continued detention of the vehicle and its occupants was therefore proper during this segment of the stop.

### c. 9:09:21–9:14:15

After Sgt. Napier searched the front passenger compartment of the vehicle, additional factors supporting a finding of reasonable suspicion were brought to light. At 9:09:15, Sgt. Napier shined his light from the front passenger compartment where he was searching to the floor of the passenger side of the backseat, the same location where he had seen Defendant disappear from

---

constitutional. There are other grounds on which the search may be found to have been constitutional, *see, e.g., United States v. Ross*, 456 U.S. 798, 820–821 (1982) (authorizing a search of a vehicle where there was probable cause to believe that the vehicle contained evidence of criminal activity), but the Court need not address these at this time. As previously discussed, Defendant had no reasonable expectation of privacy in the Ford Fusion and therefore has no standing to challenge the search in question. His only standing is to challenge the length of his detention, which need only have been justified by a reasonable suspicion of criminal activity.

view at the beginning of the stop. ECF No. 54-1. Seeing the duffel bag at that time, Sgt. Napier immediately opened the backseat passenger side door and shined his light directly on the duffel bag that was on the floor in between Defendant's legs. *Id.*, at 9:09:25 a.m. After seeing the bag with his light, Sgt. Napier directed Defendant out of the car and briefly searched his person before returning to the backseat to retrieve the duffel bag.[4] *Id.* Less than 30 seconds elapsed between the time Sgt. Napier opened the backseat passenger side door where Defendant had been sitting and the time Sgt. Napier removed the duffel bag from the backseat, placing it on the pavement outside of the car. *Id.*, 9:09:30–9:09:52.

After placing the duffel bag on the pavement, Sgt. Napier turned his attention to Defendant and the two men still occupying the vehicle and asked, "Whose bag is this?" ECF No. 54-1, at 9:09:52. When no one answered, he repeated the question several times. *Id.* After fifteen seconds of asking without receiving any response, Sgt. Napier turned to Defendant directly and asked, "Is this your bag?" *Id.* At that time, Defendant shook his head no and denied ownership of the bag. *Id.* Even after further inquiry, no one in the vehicle claimed ownership or knowledge of the black duffel bag. *Id.*

At this point in the stop, Sgt. Napier's reasonable suspicion was further bolstered by there being a suspicious bag in the vehicle, in the exact place where the officer had seen Defendant disappear from sight at the beginning of the stop, to which no one in the vehicle would lay claim. Again, "[w]hen an officer has reasonable suspicion of criminal activity, he may detain the

---

[4] The Court notes that, while this segment of the traffic stop/detention was proper pursuant to Sgt. Napier's reasonable suspicion, the Supreme Court has held that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." *Maryland v. Wilson*, 519 U.S. 408, 415 (1997). Therefore, while the length of the detention was justified by reasonable suspicion, the manner and extent of the detention – that is, ordering Defendant to exit the vehicle – was also properly within the scope of a routine traffic stop under relevant jurisprudence.

suspect[s] so as to permit the officer to allay the suspicion." *Ortiz*, 669 F.3d at 444 (internal citation and quotation omitted). Sgt. Napier's continued detention of Defendant and the other occupants of the vehicle was justified pursuant to his mission to allay his reasonable suspicion of criminal activity. As Sgt. Napier set out to allay his suspicion, however, he only uncovered grounds for even more suspicion. As such, Sgt. Napier was legally permitted to continue the detention until such a time that there were no longer grounds for reasonable suspicion or the criminal activity he suspected was, in fact, uncovered.

The rest of the body camera recording shows Defendant and the vehicle's other occupants continue to deny knowledge or ownership of the duffel bag. ECF No. 54-1. Sgt. Napier called for backup and secured Defendant and the vehicle's other occupants pending his investigation into the contents of the suspicious bag. *Id.* As his reasonable suspicion persisted, the detention remained reasonable up to and including the point at which Sgt. Napier finally discovered the guns contained in the duffel bag. Accordingly, at no time did Sgt. Napier's detention of Defendant become unreasonable such that Defendant's Fourth Amendment rights were violated.

In summary, the Court finds that Sgt. Napier sufficiently offered "specific and articulable facts that demonstrate[d] at least a minimal level of objective justification for [his] belief that criminal activity [was] afoot" during his detention of Defendant. Sgt. Napier observed unusual movement in the backseat when he first stopped the Ford Fusion, then saw Defendant disappear from sight for a moment; the driver of the vehicle was unusually nervous when Sgt. Napier approached the vehicle; the driver's demeanor and conduct was out of character for him, which Sgt. Napier knew due to prior interactions with the driver; no one in the vehicle could provide identification; one of the passengers in the vehicle was the subject of two outstanding arrest warrants; and there was a suspicious bag in the vehicle to which none of the vehicle's occupants

would admit ownership. Bearing in mind the applicable standard and the context in which these factors were presented, the Court considers these factors holistically and objectively. Doing so, the Court **FINDS** that, to the extent that Sgt. Napier detained Defendant for a period of time that was not within the scope of a routine traffic stop, Sgt. Napier had the requisite reasonable suspicion of criminal activity to do so permissibly and constitutionally.

## IV. Conclusion

Because Defendant's detention was justified – first by the traditional incidents of a routine traffic stop and then by Sgt. Napier's reasonable suspicion of criminal activity – his Fourth Amendment right to be free from unreasonable seizure was not violated by Sgt. Napier's detention of him during the stop at issue in this case. Accordingly, because the stop was reasonable and justified, the evidence Sgt. Napier uncovered during that detention may properly be admitted against Defendant in the pending case. For the foregoing reasons, Defendant's Motion to Suppress, ECF No. 38, is **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel and the defendant, the United States Attorney's Office, the United States Probation Office, and the United States Marshals Service.

ENTER:     June 4, 2018

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE